IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

RANDY RICE,

      Petitioner,

v.                                                                    No. 1:18-cv-02711-JDB-jay

BERT C. BOYD,

      Respondent.


ORDER DIRECTING CLERK TO SEAL DOCUMENTS,
DENYING § 2254 PETITION,
DENYING CERTIFICATE OF APPEALABILITY,
AND
DENYING LEAVE TO APPEAL IN FORMA PAUPERIS


Petitioner, Randy Rice, has filed a pro se habeas corpus petition (the "Petition"), pursuant to 28 U.S.C. § 2254 (Docket Entry ("D.E.") 1), as well as an amendment to the Petition (D.E. 19, 31). For the following reasons, the Petition, as amended, is DENIED.[1]

BACKGROUND

In March 2008, a Madison County, Tennessee, grand jury charged Rice and Jessie Rodgers with first degree murder, first degree murder in perpetration of "Aggravated Robbery and/or Attempt to Commit Aggravated Robbery," and especially aggravated robbery. (D.E. 13-1 at PageID 50-53.) The charges related to the 2004 robbery and shooting death of David Martin in his home. Rice was tried separately from Rodgers. *See State v. Rice*, No. W2010-00146-CCA-

---

[1] The Clerk is DIRECTED to seal the documents at D.E. 13-1 and 13-3 because they contain sensitive personal identifying information about Petitioner.

R3-CD, 2011 WL 3556973, at *1 (Tenn. Crim. App. Aug. 9, 2011), *perm. appeal denied*, (Tenn. Dec. 13, 2011).

At trial, law enforcement officers, medical witnesses, and forensic scientists provided evidence regarding the victim's cause of death and ballistic and forensic details of the crime.  (D.E. 13-5, 13-6.)  The victim, who "was found inside his residence" on August 20, 2004, "suffered four gunshot wounds" including two fatal gunshot wounds to his chest.  *Rice*, 2011 WL 3556973, at *1.  "The victim also had small cuts on the left side of his face, ear, and neck, some of which contained fragments of glass," as well as "scrapes on both of his arms and on the left side of his abdomen."  *Id.*  Bullets removed from his body and recovered in the hallway were .32 caliber "fired from the same gun."  *Id.*  "Several items, including some broken glass material in the living room, were covered in blood and were collected from the victim's home."  *Id.*

The victim's brother testified that he had entered the victim's living room following the shooting and recalled that "the [] home 'was in disarray' and there were signs of a 'struggle.'"  *Id.*  He explained that the victim "often kept his [casino] winnings from Tunica on his person or in his house."  *Id.*  He related that he could not find his brother's wallet following his brother's death.  *Id.*

Lawrence James, a forensic scientist with the Tennessee Bureau of Investigation ("TBI"), testified that he performed DNA tests on blood samples taken from the Rice, Rodgers, and the victim.  *Id.*; (D.E. 13-6 at PageID 645-78.)  He reported that a "partial profile did not exclude the victim but did exclude" Rice and Rodgers.  *Rice*, 2011 WL 3556973, at *1.  "DNA testing of other items collected from the home showed that the blood matched that of the victim."  *Id.*

2

Lieutenant Jeff Fitzgerald from the Madison County Sheriff's Office testified that "in 2004 and going into 2005," law enforcement did not have suspects for the robbery and murder. (D.E. 13-6 at PageID 682-83.) That changed when "officers received information about the Defendant– Appellant's involvement in the offenses against the victim from Cory Bowers, an individual who was facing federal drug charges." *Rice*, 2011 WL 3556973, at *1. Fitzgerald explained that "Bowers was convicted of his federal charges prior to [Rice's] trial, [but] his cooperation . . . was communicated to the U.S. Attorney's office." *Id.* The federal prosecutor "promised Bowers a reduced sentence in exchange for his assistance in the prosecution of" Rice. *Id.*

In subsequent interviews with the Sheriff's Department, Rice "consistently denied that he was involved in the robbery and murder until November 13, 2007." *Id.* at *2. On that day, he "admitted that he was, in fact, involved in the offenses against the victim." *Id.* Fitzgerald recounted that the Defendant gave his statement after waiving his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). (D.E. 13-6 at PageID 687-88.) The statement, which was memorialized in writing and accompanied by Rice's initials, provided the Defendant's version of events. The document was introduced into evidence and read in open court. (*Id.* at PageID 697-702.) According to his statement, the Defendant and

> his brother Robert Rice, and Jessie Rodgers went to the victim's house intending to commit a robbery. Initially, Robert Rice drove by and identified the victim's house. Later, the Defendant–Appellant drove Rodgers to the victim's house, dropped him off a short distance from the house, and then circled back to the area as Rodgers went inside the house. The Defendant–Appellant was aware that Rodgers was going to "hit the house and rob the [victim]." When Rodgers did not exit the house within a short amount of time, the Defendant–Appellant parked his car in front of the victim's house and approached the slightly open door of the victim's residence. He "hollered" for Rodgers to come outside so they could leave. When Rodgers finally appeared, he was bleeding "real bad [sic]" and informed the Defendant–Appellant that he had been "hit." During the scuffle, the victim threw something and hit Rodgers in the eye. Rodgers told the Defendant–Appellant that he and the victim

3

had wrestled over the gun and that he had shot the victim. The Defendant–Appellant drove Rodgers to his sister's home in Humboldt. When they got back to their neighborhood, Rodgers told everyone about the crime, and Robert Rice told him that he needed to go back to the victim's house and remove his fingerprints from everything he touched. Rodgers subsequently borrowed someone's car and went back to the victim's house. At nighttime, Rodgers returned with the victim's black wallet. Rodgers claimed that he only stole eighty dollars from the victim. Rodgers then gave the Defendant–Appellant and Robert Rice twenty dollars each. The Defendant–Appellant said that he never entered the victim's house the day of the offense. He also claimed that he did not tell anyone about the crime before giving the November 13, 2007 statement because he was frightened.

*Rice*, 2011 WL 3556973, at *2.[2]

Cory Bowers testified that "he, the Defendant–Appellant, and Jessie Rodgers had been friends since they were children." *Id.* He recalled that "[p]rior to the offenses in this case, Bowers said that he and the Defendant–Appellant had driven by the victim's house, and the Defendant–Appellant had told Bowers that he knew the victim had money inside the house." *Id.* Rice "asked Bowers if he would go into the house with him to take the money." *Id.* Bowers declined. *Id.* "[A] week later," Rice again asked Bowers to go along with the plan, but Bowers "told him no." (D.E. 13-6 at PageID 725.)

The witness further recalled that, "[o]n the day the offenses were committed . . . the Defendant–Appellant was gone from the neighborhood for approximately two hours and returned 'with scratches and stuff on him.'" *Rice*, 2011 WL 3556973, at *2. "When he returned, the Defendant–Appellant told Bowers that he had stolen the victim's money and had shot the victim." *Id.* Bowers testified that Rodgers, who was with Rice, "was shaking and looked frightened." *Id.*

---

[2] Defense counsel filed a pre-trial motion to suppress the November 13, 2007, statement, which was denied after an evidentiary hearing. *Rice v. State*, No. W2016-02592-CCA-R3-PC, 2017 WL 4570537, at *1 (Tenn. Crim. App. Oct. 12, 2017), *perm. appeal denied*, (Tenn. Feb. 15, 2018).

4

The witness said the Defendant explained "that the victim 'got to tussling with them[,]' and the Defendant–Appellant had to shoot the victim because 'he wouldn't be still.'"  *Id.* (alteration in original).

"On cross-examination, Bowers acknowledged that the Defendant–Appellant's brother, Robert Rice, was responsible for his arrest on the federal drug charges."  *Id.*  He conceded that his federal sentence would be reduced based on the federal judge's determination of "the effectiveness of his testimony[.]"  *Id.*  He stated that "he could have just as easily blamed Rodgers as the Defendant–Appellant for these crimes," but "on re-direct examination [he] confirmed that he had not lied about the Defendant–Appellant's involvement in the crimes in order to get a reduced federal sentence."  *Id.*

The Defendant's brother, Robert Rice, testified that he was not involved in the crimes and described as "lie[s]" his brother's statements to the contrary.  (D.E. 13-6 at PageID 752.)  The witness "said that his brother regularly tells lies about him."  *Rice*, 2011 WL 3556973, at *3.  "On cross examination, he admitted that he had cooperated with the federal authorities to 'set up' Bowers because he had a prior conviction for cocaine distribution."  *Id.*

"During deliberations, the jury submitted two questions regarding their consideration of lesser-included offenses for the charge of premeditated first degree murder; the State moved to nolle that charge."  *Rice*, 2017 WL 4570537, at *2.  The jury found Rice guilty of felony murder and facilitation of especially aggravated robbery.  *Id.*  He received consecutive sentences of life plus twelve years' incarceration.  *Id.*

Petitioner pursued an unsuccessful direct appeal challenging the sufficiency of the evidence and the imposition of consecutive sentences.  *Rice*, 2011 WL 3556973, at *3, 8.  He subsequently

sought post-conviction relief, which was denied after an evidentiary hearing.  *Rice*, 2017 WL 4570537, at *4.

> "On appeal, Petitioner argue[d] that he received ineffective assistance of counsel when trial counsel failed to request a jury instruction on corroboration of accomplice testimony with regard to Mr. Bowers; when trial counsel failed to move for a judgment of acquittal on the felony murder charge after the jury found him guilty of facilitation of especially aggravated robbery; and when appellate counsel failed to raise the denial of the motion to suppress Petitioner's statement as an issue on appeal."

*Id.*  The Tennessee Court of Criminal Appeals ("TCCA") affirmed.  *Id.* at *7.

DISCUSSION

Rice filed the Petition on October 11, 2018.  In Claim 1, he asserts that trial and appellate counsel rendered ineffective assistance in numerous respects.  Specifically, he maintains that trial counsel was ineffective for failing to meaningfully communicate with him (Claim 1(a)); properly investigate his case (Claim 1(b)); "interview all witnesses who could have testified that [he] was not the shooter" (Claim 1(c)) (D.E. 1-1 at PageID 7); communicate with Petitioner in order to develop a coherent trial strategy relating to "the impeachment of the witness Bowers and others" (Claim 1(d)) (*id.* at PageID 8); request an accomplice corroboration jury instruction (Claim 1(e)); compel production of statements Bowers made to law enforcement (Claim 1(f)); seek clarification of the jury instructions (Claim 1(g)); adequately present evidence during the suppression hearing (Claim 1(h)); and suppress Petitioner's statement to police on the ground that there was no probable cause for his arrest (Claim 1(i)).  Petitioner posits that appellate counsel rendered ineffective assistance by declining to argue that the trial court erred in denying the suppression motion (Claim 1(j)) and by failing to present a cumulative-error argument (Claim 1(k)).

6

Rice also asserts that the State, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), withheld prior statements Bowers allegedly made to law enforcement that could have been used by the defense to impeach his trial testimony (Claim 2); the prosecution failed to preserve evidence (Claim 3); the State engaged in prosecutorial misconduct (Claim 4); Petitioner's right to counsel was violated (Claim 5); the jury instructions were constitutionally defective (Claim 6); Petitioner's sentence violates the Eight Amendment (Claim 7); the evidence was insufficient to support Petitioner's convictions (Claim 8); and Petitioner's rights were violated due to cumulative errors of the trial court and prosecution (Claim 9).[3]

The official § 2254 form used by Petitioner to present his claims contained the directive "If any of the grounds listed . . . above were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them." (D.E. 1 at PageID 5 (emphasis in original).) In response, Rice wrote "N/A." (*Id.*)

Respondent, Bert C. Boyd, filed the state-court record and an answer (the "Answer") to the Petition in December 2018. (D.E. 13, 14.) He argues that most of the claims are not properly before the Court because Petitioner procedurally defaulted them, and that the exhausted claims are without merit.

On March 11, 2019, the inmate filed a motion to amend the Petition to provide factual allegations in support of Claim 1(c), which asserts that counsel provided ineffective assistance by failing to interview witnesses who would have testified that he was not the shooter. (D.E. 19.) Petitioner sought the Court's permission to add the allegation that his sister, Queca Rice, would

---

[3]  The Court has renumbered the claims for ease of discussion.

have testified that Jessie Rogers confessed to her that he shot the victim.  Respondent opposed the motion on the ground that amendment would be futile because Claim 1(c) is procedurally defaulted.  (D.E. 25.)

Rice filed a responsive brief insisting that the proffered allegation supports the claim.  (D.E. 30.)  Although he did not identify any cause and prejudice to excuse the default, he seemed to suggest that the Court should review the merits of Claim 1(c) because he was wrongfully convicted through Bowers' untrue testimony that he confessed to shooting the victim.  He posited that his sister's testimony would have proven that Bowers' testimony was false.  Liberally construed, the argument appeared to be an assertion of a gateway claim of actual innocence.  On January 27, 2020, the Court granted the motion to amend, but advised the parties that it would "consider Respondent's procedural default affirmative defense, and Petitioner's arguments in opposition to that defense, at the time it issues a ruling on all claims."  (D.E. 31.)

In August 2020, Petitioner filed an out-of-time reply (the "Reply") in support of the Petition.  (D.E. 35.)  Attached to the Reply is his sworn statement and copies of documents relating to his efforts to secure the allegedly missing Bowers statements.  (D.E. 35-1, 35-2.)  In the body of the Reply, the inmate asserts that his procedural defaults should be excused because he is actually innocent of the crimes of which he was convicted.  In addition, he maintains that his post-conviction appellate counsel's ineffective assistance caused him to procedurally default Claims 1(d), 1(f), 1(h), Claim 2, Claim 3, and Claim 7.[4]  (D.E. 35 at PageID 2621 ("post-conviction

---

[4]  Claims 1(d), 1(f), 1(h), Claim 2, Claim 3, and Claim 7 correlate, respectively, to Claims 1(4), 1(6), 1(8), Claim 3, Claim 4, and Claim 8, as referenced in the Petition and in the Reply.  (*See* D.E. 35 at PageID 2621.)  With regard to Claim 1(e) (which is Claim 1(5) in the Petition and Reply), Petitioner asserts that the procedural default of this claim should also be excused.  (*See*

appellate lawyer decided on his own and in direct contravention to Petitioner's repeated directives, to not include [the claims] in his appeal").)  Although he fails to also argue that the procedural default of his *Brady* claim (Claim 2) is excused because the claim is meritorious, Respondent broached the subject in its Answer.  Therefore, the Court will assess whether Petitioner has established cause and prejudice to overcome the procedural default of the *Brady* claim through a showing of the claim's merits.  *See Banks v. Dretke*, 540 U.S. 668, 691 (2004).

Four months after he submitted the Reply, Rice filed a motion for discovery on his *Brady* claim seeking production of the allegedly undisclosed Bowers statements.  (D.E. 37.)  In his motion, he outlined the efforts he had undertaken to acquire the purported statements, including making a public records request to the Tennessee Public Defenders Office.  Respondent filed a brief in opposition to the motion, arguing that Petitioner did not provide specific factual allegations that would suggest that the documents he seeks actually exist, and that he did not specify how the documents, if extant, would have been material to the defense.  (D.E. 38.)  The Court agreed and held that Petitioner had not established good cause to grant discovery.  The Court also found that the inmate filed his request for discovery several months after substantive briefing had concluded but he did not explain the reason for the delay.  (D.E. 41 at PageID 2692.)  Nevertheless, the parties were advised that, at the time the Court reviews the merits of the Petition and the parties' substantive briefs, it would determine if additional materials are needed to resolve the *Brady* claim. In addition, in order to help inform the Court's determination, Petitioner was directed to file the

---

*id.*)  However, he did not procedurally default Claim 1(e), but raised it in his post-conviction appeal.  As discussed *infra*, the TCCA's rejection of the claim was not unreasonable.

response he received from the Tennessee Public Defenders Office to his public records request. Rice thereafter filed a copy of that response.  (D.E. 42.)

I.    <u>Legal Standards</u>

A.  Federal Habeas Review

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by § 2254, as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA").  *See* 28 U.S.C. § 2254.  Under § 2254, habeas relief is available only if the prisoner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The availability of federal habeas relief is further restricted where the petitioner's claim was "adjudicated on the merits" in the state courts.  28 U.S.C. § 2254(d).  In that circumstance, the federal court may not grant relief unless the state-court decision "'was contrary to' federal law then clearly established in the holdings of [the Supreme] Court; or . . . 'involved an unreasonable application of' such law; or . . . 'was based on an unreasonable determination of the facts' in light of the record before the state court."  *Harrington v. Richter*, 562 U.S. 86, 100 (2011) (quoting 28 U.S.C. § 2254(d)(1)-(2)) (citations omitted)).

A state court's decision is contrary to federal law when it "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law," or when "the state court confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at" an "opposite" result.  *Williams v. Taylor*, 529 U.S. 362, 405 (2000).  An unreasonable application of federal law occurs when the state court, having invoked the correct governing legal principle, "unreasonably applies the law of this Court to the facts of a prisoner's case."  *Id.* at 409.

For purposes of § 2254(d)(2), a state court's "factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). The Sixth Circuit construes § 2254(d)(2) in tandem with § 2254(e)(1) to require a presumption that the state court's factual determination is correct in the absence of clear and convincing evidence to the contrary. *Ayers v. Hudson*, 623 F.3d 301, 308 (6th Cir. 2010) (citing *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003)). A state court's factual findings are therefore "only unreasonable where they are 'rebutted by clear and convincing evidence and do not have support in the record.'" *Moritz v. Woods*, 692 F. App'x 249, 254 (6th Cir. 2017) (*quoting Pouncy v. Palmer*, 846 F.3d 144, 158 (6th Cir. 2017)) (internal quotation marks omitted).

Before a federal court will review the merits of a claim brought under § 2254, the petitioner must have "exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). To be properly exhausted, a claim must be "fairly presented" through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845, 848 (1999).

The exhaustion requirement works in tandem with the procedural-default rule, which generally bars federal habeas review of claims that were procedurally defaulted in the state courts. *Id.* at 848. A petitioner procedurally defaults his claim where he fails to properly exhaust available remedies (that is, fails to fairly present the claim through one complete round of the state's appellate review process), and he can no longer exhaust because a state procedural rule or set of rules have closed-off any "remaining state court avenue" for review of the claim on the merits. *See Harris v. Booker*, 251 F. App'x 319, 322 (6th Cir. 2007). Procedural default also occurs where the state

11

court "actually . . . relied on [a state] procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985). To cause a procedural default, the state court's ruling must "rest[] on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991) (citing *Fox Film Corp. v. Muller*, 296 U.S. 207, 210 (1935); *Klinger v. Missouri*, 80 U.S. 257, 263 (1871)).

A petitioner will be entitled to federal court review of the merits of a claim that was procedurally defaulted if he demonstrates "cause for the default and actual prejudice as a result of the alleged violation of federal law[.]" *Id.* at 750. The ineffective assistance of post-conviction counsel generally is not cause to excuse a procedural default. *Id.* at 753. However, the ineffectiveness of post-conviction trial counsel may be cause to excuse the default of an ineffective-assistance-of-trial-counsel claim. *Trevino v. Thaler*, 569 U.S. 413, 423 (2013) (citing *Martinez v. Ryan*, 566 U.S. 1, 14, 16-17 (2012)). A petitioner may also overcome his procedural defaults by establishing a "gateway" claim of actual innocence. *Schlup v. Delo*, 513 U.S. 298, 315 (1995).

B. Ineffective Assistance of Counsel

A claim that an attorney's ineffective assistance has deprived a criminal defendant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Pollini v. Robey*, 981 F.3d 486, 493 (6th Cir. 2020), *cert. denied*, No. 20-7918, 2021 WL 2519379 (U.S. June 21, 2021). To succeed on such a claim, a petitioner must demonstrate two elements: (1) "that counsel's performance was deficient"; and (2) "that the deficient performance prejudiced the defense." *Strickland*, 466 U.S. at 687. "The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so

undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 686.

To establish deficient performance, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. A court considering a claim of ineffective assistance must apply "a strong presumption" that the attorney's representation was "within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation marks omitted).

An attorney's "strategic choices" are "virtually unchallengeable" if based on a "thorough investigation of law and facts relevant to plausible options . . . ." *Id.* at 690-91. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Id.*

To demonstrate prejudice, a petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.'" *Harrington*, 562 U.S. at 104 (quoting *Strickland*, 466 U.S. at 693) (citations omitted). Instead, "[c]ounsel's errors must be 'so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Id.* (quoting *Strickland*, 466 U.S. at 687).

*Strickland*'s two-part test applies to claims of ineffective assistance of appellate counsel. *Smith v. Robbins*, 528 U.S. 259, 285-86 (2000). A petitioner meets the deficient performance prong by showing that "his appellate counsel made an objectively unreasonable decision by

choosing to raise other issues instead of" the challenged issue, "meaning [the challenged] issue 'was clearly stronger than issues that counsel did present.'"  *Webb v. Mitchell,* 586 F.3d 383, 399 (6th Cir. 2009) (quoting *Robbins*, 528 U.S. at 285, 288).  The prejudice prong requires a petitioner to "demonstrate 'a reasonable probability that, but for his counsel's unreasonable failure to' raise th[e] issue on appeal, 'he would have prevailed.'" *Id.* (quoting *Robbins,* 528 U.S. at 285).

The deference to be accorded a state-court decision under 28 U.S.C. § 2254(d) is magnified when a federal court reviews an ineffective assistance claim:

> Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Richter*, 562 U.S. at 105.

C.  Sufficiency of the Evidence

The Supreme Court's decision in *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979), provides the federal due process standard for evidentiary sufficiency in criminal cases.  *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam) (holding *Jackson* applies to sufficiency-of-the-evidence claims on habeas review under § 2254(d)).  In *Jackson*, the Supreme Court announced that "the relevant question" "on review of the sufficiency of the evidence to support a criminal conviction," is whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 318-19 (emphasis in original).

The *Jackson* standard "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from

14

the basic facts to ultimate facts." *Id.* at 319. *See also Cavazos v. Smith*, 565 U.S. 1, 2 (2011) (per curiam) (holding that, under *Jackson*, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial."). *Jackson*'s evidence-sufficiency standard may be met with circumstantial evidence. *See Desert Palace, Inc., v. Costa*, 539 U.S. 9, 100 (2003) ("[W]e have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *see also United States v. Algee*, 599 F.3d 506, 512 (6th Cir. 2010) ("Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not remove every reasonable hypothesis except that of guilt.").

The AEDPA adds a layer of deference to *Jackson's* already deferential standard. By virtue of the AEDPA's command that federal habeas relief may issue only if the state court's decision is "contrary to" controlling federal law or "based on an unreasonable application" of the controlling federal law, 28 U.S.C. § 2254(d)(1)-(2), a state court determination that the evidence satisfied the deferential *Jackson* standard is itself "entitled to considerable deference" by the federal habeas court. *Coleman*, 566 U.S. at 656.

II.   Merits Review of Claims 1(e), 1(j), and 8

Rice presents three claims that he fully exhausted in the state courts by raising them in the Tennessee Court of Criminal Appeals. Boyd argues that the TCCA's decisions rejecting the claims survive AEDPA review. Respondent's position is well-taken.

A.  Claim 1(e)

Petitioner maintains that trial counsel rendered ineffective assistance by failing to request a jury instruction on corroboration of accomplice testimony with regard to the testimony of Cory

15

Bowers.  He unsuccessfully pursued the claim in the post-conviction trial court and on appeal.  *See Rice*, 2017 WL 4570537, at *5.

Under Tennessee law, "a conviction may not be based solely upon the uncorroborated testimony of an accomplice to the offense."  *Id.* at *5 (quoting *State v. Bane*, 57 S.W.3d 411, 419 (Tenn. 2001)).  "An accomplice is one who knowingly, voluntarily, and with common intent unites with the principal offender in the commission of a crime."  *Id.* (quoting *State v. Allen*, 976 S.W.2d 661, 666 (Tenn. Crim. App. 1997)).  A witness is an accomplice if "he or she could be indicted for the same offense charged against the defendant."  *Id.* (citing *State v. Jones*, 450 S.W.3d 866, 888 (Tenn. 2014)).

In assessing Rice's argument that counsel should have requested an accomplice instruction for Bowers' testimony, the TCCA first identified *Strickland*'s standards as governing its analysis. *Id.* at *4-5.  The court reviewed the criminal trial record and found nothing in Bowers' testimony to suggest he was an accomplice of Rice.  *Id.* at *5.  The court noted that "Mr. Bowers testified at trial that Petitioner twice approached him and discussed robbing the victim, and both times Mr. Bowers refused to help."  *Id.*  The TCCA also found that Petitioner's own confession to police "did not implicate Mr. Bowers in planning the robbery, committing the robbery, or sharing in the proceeds from the robbery."  *Id.*  The court therefore concluded that "trial counsel was not ineffective in failing to request a jury instruction that was not supported by the evidence."  *Id.*

The TCCA's determination was not contrary to clearly established Supreme Court law or based on unreasonable factual findings.  As mentioned, the appellate court identified *Strickland*'s standards and applied them to the facts adduced at trial.  "A run-of-the-mill state-court decision applying the correct legal rule from [Supreme Court] cases to the facts of a prisoner's case would

16

not fit comfortably within § 2254(d)(1)'s 'contrary to' clause." *Williams v. Taylor*, 529 U.S. 362, 406 (2000).   In addition, Petitioner does not argue that the state appellate court's decision was based on unreasonable factual determinations as to the contents of Bowers' testimony and his own confession.   He therefore has not identified any clear and convincing evidence to undermine the court's findings.

Based on the facts adduced, the TCCA's conclusion that counsel did not perform deficiently by deciding not to make a futile request for an accomplice jury instruction, and that Petitioner was not prejudiced thereby, was not an unreasonable application of *Strickland*'s standards to Rice's case.  Claim 1(e) is DENIED.

B.  Claim 1(j)

Petitioner asserts that appellate counsel was ineffective for failing to challenge on direct appeal the trial court's denial of his motion to suppress.   Respondent argues that the TCCA's rejection of the claim was not contrary to, or based on an unreasonable application of, clearly established Supreme Court law, and was not the result of unreasonable factual determinations. The Court agrees.

Prior to trial, defense counsel filed a motion to suppress Petitioner's November 13, 2007, statement to law enforcement on the ground that the officers did not inform Rice's appointed attorney that they would be speaking with the Defendant and that the Defendant did not waive his right to counsel before giving the statement.  (D.E. 13-13.)  At the suppression hearing, Lieutenant Fitzgerald testified that he was in the General Session Court on November 13, 2007, awaiting Rice's arraignment.  (*Id.* at PageID 1075.)  At that time, "Mr. Rice was sitting against the wall . . . prior to the [j]udge coming to the bench," and Fitzgerald "was on the other side of the courtroom."

(*Id.*)  The Defendant twice motioned for the officer to come over, which the officer eventually did. (*Id.* at PageID 1076.)  Rice told Fitzgerald that he wanted to speak with him about the case, to which Fitzgerald replied that it would have to wait until after the arraignment because the judge was coming onto the bench.  (*Id.* at PageID 1076-77.)  Petitioner was arraigned and an attorney was appointed to represent him. (*Id.* at PageID 1088.)  After the proceedings were concluded, and "[a]s [Rice] was leaving the courtroom headed back, he motioned again like don't forget me, and that's when [Fitzgerald] asked him 'You still want to talk?' And he said he did."  (*Id.* at PageID 1088.)  The officers and the Defendant then walked to Fitzgerald's office, where the Defendant received a *Miranda* warning and signed a waiver of those rights.  (*Id.* at PageID 1090-92.)  Rice was asked whether he initiated contact with the officer and he said he had.  He then proceeded to provide his version of the events surrounding the murder and robbery of David Martin. (*See Id.*)

At the post-conviction hearing, Petitioner asserted that both trial and appellate counsel provided ineffective assistance regarding the suppression issue.  He testified that he never "initiated contact with the investigators either before or after his arraignment on November 13, 2007." *Rice*, 2017 WL 4570537, at \*2.  He insisted that he did not motion for Lieutenant Fitzgerald to come speak with him, but rather "was moving around like don't touch me[.]" *Id.*  Rice explained that he had been interrogated six times before he gave his statement on November 13, 2007. *Id.*  He testified that at his November 12, 2007, interview he invoked his right to counsel. *Id.*  He insisted that trial counsel therefore should have secured a copy of the November 12th interview in order to argue at the suppression hearing that his right to an attorney was violated when he was interrogated on November 13th. *Id.*  He also argued that appellate counsel should have appealed the denial of the suppression motion. *Id.*

18

Appellate counsel testified that he "look[ed] into the suppression issue . . . 'very thoroughly.'" *Id.* at *3. He "requested two continuances during the appeal in order to review the suppression hearing and research the issue." *Id.* Counsel "recalled the suppression issue being 'well-argued on both sides' and there being 'a pretty specific ruling by the trial judge, which seemed to be very consistent with the law about the way those sorts of statements could be taken.'" *Id.* Counsel explained that he had concluded that an argument challenging the trial court's denial of the suppression motion would have been weak. *Id.* His strategy was to focus on stronger issues in his appellate brief, which he believed were those relating to consecutive sentencing and evidence sufficiency. *Id.* "On cross-examination, [he] testified that he believed the chance of success in appealing the suppression issue 'was almost nonexistent[,] [a]nd it would probably focus the interest to the Court of Criminal Appeals' panel away from what [he] thought was the best issue for [Petitioner].'" *Id.*

The post-conviction trial court credited appellate counsel's explanations and rejected the claim from the bench and also in a written order. (D.E. 13-20 at PageID 1330-31; D.E. 13-19 at PageID 1319.) Petitioner appealed the adverse ruling. *Rice*, 2017 WL 4570537, at *6-7. He argued before the TCCA that that his appellate counsel was ineffective for failing to challenge the denial of the motion to suppress "because he unequivocally invoked his right to counsel" prior to giving his November 13, 2007, statement to police, and because "the record [showed] that law enforcement initiated contact with the Petitioner following the appointment of counsel." *Id.* at *6.

In affirming the lower court's decision, the TCCA first identified *Strickland*'s standards as supplying the relevant test for claims challenging the assistance of appellate counsel. *Id.* at *5-6. The court noted that "an attorney is 'not constitutionally required to raise every conceivable

issue on appeal,'" and that a decision as to which issues to raise "are strategic decisions 'within appellate counsel's sound discretion[.]'" *Id.* at *6 (quoting *Carpenter v. State*, 126 S.W. 3d 879, 887 (Tenn. 2004)).

Reviewing the records from the direct appeal, the TCCA found that "appellate counsel moved to supplement the record with a transcript of the suppression hearing and sought multiple continuances, which appellate counsel explained were for the purpose of conducting research on the suppression issue." *Id.* The court credited appellate counsel's testimony at the post-conviction hearing "that he made a strategic decision not to raise the suppression issue after 'very thoroughly' considering the facts and the law" and "that based on his research and the trial court's detailed findings, he did not believe that [the TCCA] would find that the issue had merit. *Id.* Finding that "[a]ppellate counsel made the strategic decision to focus on what he believed to be the strongest appellate issue," the TCCA noted that "[t]hese types of "'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable.'" *Id.* (quoting *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 690–91)).

The court also found that "Petitioner ha[d] not shown that the [suppression] issue had any merit." *Id.* at *7. In particular,

> [t]he only evidence that Petitioner did not initiate contact with law enforcement was his testimony at the post-conviction hearing, which would not have been available to appellate counsel. Additionally, Petitioner agreed that Lieutenant Fitzgerald read the *Miranda* warnings to him, that he understood them, and that he waived his rights before making his statement. The law is clear that even after a defendant has been appointed an attorney, he may make a knowing waiver of his right to counsel. *See Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) ("Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and

intelligent. The defendant may waive the right whether or not he is already represented by counsel; the decision to waive need not itself be counseled.") (internal citations omitted); *see also State v. Willis*, 496 S.W.3d 653, 714–15 (Tenn. 2016); *State v. March*, 395 S.W.3d 738, 767–71 (Tenn. Crim. App. 2011).

*Id.*

The TCCA further held that "[w]hether Petitioner invoked his right to counsel during the missing November 12 statement would likewise have no bearing on his ability to waive his right to counsel on November 13." *Id.* (citing *State v. Cauthern*, 778 S.W.2d 39, 46 (Tenn. 1989) ("The U.S. Supreme Court has clearly sanctioned the admissibility of a statement given after the appointment of counsel and even after defendant has 'expressed his desire to deal with police only through counsel,' where defendant initiates further communication, electing 'to face the state's officers and go it alone,' and knowingly and intelligently waives his Sixth Amendment right to counsel.") (quoting *Patterson v. Illinois*, 487 U.S. 285 (1988); *Edwards v. Arizona*, 451 U.S. 477 (1981))).   The court therefore concluded that, [b]ecause Petitioner has not shown that the suppression issue had any merit, appellate counsel was not ineffective for failing to raise it on direct appeal." *Id.*

The TCCA's decision is not contrary to clearly established Supreme Court law.  The court correctly identified *Strickland*'s two-part test as governing its analysis.  In addition, the court's view of how that test applies to appellate counsel's conduct is consistent with Supreme Court pronouncements.  *See e.g., Davila v. Davis*, 137 S. Ct. 2058, 2067 (2017) ("Declining to raise a claim on appeal . . . is not deficient performance unless that claim was plainly stronger than those actually presented to the appellate court.").

The decision was also not based on unreasonable factual findings.  The post-conviction trial court credited appellate counsel's testimony regarding his efforts and his decision-making

(D.E. 13-20 at PageID 1330), and the TCCA implicitly declined to reject that credibility finding. This Court, sitting in federal habeas, will not disturb the TCCA's own refusal to disrupt the lower court's credibility determination. *See Rice v. Collins*, 546 U.S. 333, 334-35 (2006) ("Reasonable minds reviewing the record might disagree about [a witness's] credibility, but on habeas review that does not suffice to supersede the trial court's credibility determination."). In addition, Petitioner has not identified clear and convincing evidence to undermine any other factual determination.

Finally, the TCCA's conclusion that appellate counsel did not render ineffective assistance was not based on an unreasonable application of *Strickland*'s precepts to the facts adduced. Appellate counsel was confronted with a trial record that supported the trial court's finding that Petitioner initiated contact with the officers both before and after the appointment of counsel and then voluntarily waived his *Miranda* rights before giving his statement. On the basis of that record, and in light of the applicable law, appellate counsel made the tactical determination that other issues were stronger than the suppression issue. But even if the merits of the suppression motion were a close call factually or legally, appellate counsel's determination of what issues to present to the TCCA is presumed to fall within the wide range of professionally reasonable conduct. Based on the record before it, the TCCA's determination that Petitioner did not overcome that presumption is not unreasonable. Claim 1(j) is DENIED.

C.   Claim 8

Petitioner asserts that the evidence was insufficient to sustain the felony murder conviction. He posits that the crime is "an intent-specific offense" and that there was a "lack of evidence." (D.E. 1-1 at PageID 13.) Respondent argues that "Petitioner provides no developed argument in

support of his claim." (D.E. 14 at PageID 2545.) He also maintains that, if Rice means to challenge the TCCA's evidence-sufficiency determination, his claim is without merit.

The Court agrees with Respondent that the inmate has not provided a developed argument. A bare assertion that there was a "lack of evidence" is insufficient from a pleading perspective. *See Rules Governing Section 2254 Cases in the United States District Courts*, Rule 2(c) ("The petition must . . . state the facts supporting each ground[.]") For that reason alone, the claim is subject to dismissal.

It may be, however, as Respondent assumes, that Petitioner intends to challenge the TCCA's determination that the evidence was sufficient to convict him of both felony murder and facilitation of especially aggravated robbery. The Court therefore assesses whether the TCCA's decision survives AEDPA review.

In pertinent part, first degree felony murder in Tennessee is the "killing of another committed in the perpetration of or attempt to perpetrate . . . robbery[.]" Tenn. Code Ann. § 39-13-202(a)(2). The mens rea of the offense is the intent to commit the underlying felony. *Id.*, § 39-13-202(b). "The killing may precede, coincide with, or follow the felony and still be considered as occurring 'in the perpetration of' the felony offense, so long as there is a connection in time, place, and continuity of action." *Rice*, 2011 WL 3556973, at *5 (quoting *State v. Buggs,* 995 S.W.2d 102, 106 (Tenn. 1999)).

An individual may be convicted of a crime under a theory of criminal responsibility. *See* Tenn. Code Ann. § 39-11-402. "An individual is criminally responsible for the conduct of another if . . . '[a]cting with the culpability required for the offense, the person causes or aids an innocent or irresponsible person to engage in conduct prohibited by the definition of the offense; [or]

[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense; or . . . [h]aving a duty imposed by law or voluntarily undertaken to prevent commission of the offense and acting with intent to benefit in the proceeds or results of the offense, or to promote or assist its commission, the person fails to make a reasonable effort to prevent commission of the offense.'" *Rice*, 2011 WL 3556973, at *5 (quoting Tenn. Code Ann. § 39–11–402).

An especially aggravated robbery is the "intentional or knowing theft of property from the person of another by violence or putting the person in fear" that is "[a]ccomplished with a deadly weapon . . . and . . . [w]here the victim suffers serious bodily injury." Tenn. Code Ann. §§ 39-13-401(a), -403(a). "A person is guilty of the facilitation of a felony 'if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39–11–402(2), the person knowingly furnishes substantial assistance in the commission of the felony.'" *Rice*, 2011 WL 3556973, at *5 (quoting Tenn. Code Ann. § 39–11–403(a)).

In his direct appeal, Petitioner argued that the evidence was insufficient to support his convictions because "there was no DNA evidence connecting him to the blood samples and physical evidence that was tested and that Bowers' identification of him as one of the perpetrators was not credible since Bowers' sentence was reduced in exchange for his testimony." *Id.* at *3. In addressing the argument, the TCCA first identified *Jackson*'s standards as controlling its analysis. *Id.* at *4. It then examined the proofs submitted at trial and, "view[ing] [them] in the light most favorable to the State," determined that the evidence "show[ed] that the Defendant-Appellant was guilty of first degree felony murder under a theory of criminal responsibility," as

24

well as facilitation of especially aggravated robbery.  *Id.* at *6.  Relying on Rice's own "version

of events," as told to law enforcement in the November 13th interview, the court found that the

evidence established that Petitioner

> drove Rodgers to the victim's house for the purpose of robbing the victim. He let
> Rodgers out near the victim's residence, and circled around to pick him up. When
> Rodgers failed to exit the victim's house after a reasonable period of time, the
> Defendant–Appellant approached the victim's door and yelled for him. Rodgers
> finally appeared, covered in blood, and informed the Defendant–Appellant that he
> had fought with the victim and had shot him. The Defendant–Appellant and
> Rodgers returned to their neighborhood, where Robert Rice convinced Rodgers to
> return to the victim's house to remove his fingerprints. Rodgers left in another
> person's vehicle, and when he returned from the victim's house, he had a black
> wallet. Rodgers told everyone that he recovered only eighty dollars from the victim
> and then gave the Defendant–Appellant and Robert Rice twenty dollars each. Based
> on this evidence, a jury could have determined, based on a theory of criminal
> responsibility, that the Defendant–Appellant "[a]cting with intent to promote or
> assist the commission of the offense, or to benefit in the proceeds or results of the
> offense" aided or attempted to aid Rodgers in killing the victim during the robbery.
> In addition, the jury could have also determined that the Defendant–Appellant was
> guilty of facilitation of especially aggravated robbery because he furnished
> substantial assistance to Rodgers, knowing that Rodgers intended to rob the victim.

*Id.*

The TCCA also ruled that "the jury could have found [] [Rice] guilty of both crimes under

a theory of direct responsibility with the defendant as the principal actor."  *Id.*  Specifically, the

jury heard "Bowers testif[y] that although Rodgers was involved in the offenses, the Defendant–

Appellant admitted to robbing and shooting the victim."  *Id.*

The TCCA's determinations were not contrary to clearly established Supreme Court law

or based on unreasonable factual findings.  As mentioned, the appellate court identified *Jackson*'s

standards and applied them to the facts adduced at trial.  In addition, Petitioner does not argue that

the court's decision was based on unreasonable factual determinations and does not identify any

clear and convincing evidence to undermine the court's findings.

25

Insofar as Rice challenges the TCCA's application of *Jackson*'s test to the evidence adduced at trial, he has failed to overcome the AEDPA's deferential standard.  Bowers' testimony was sufficient to sustain a conviction for felony murder under a theory of direct responsibility.  To the extent the jury believed Bowers, the TCCA gave "full play to the responsibility of the trier of fact" to make that credibility determination.  *Jackson*, 443 U.S. at 319.  Moreover, Rice's own version of the events, as described to the police, was sufficient for the jury to find every element of the offenses under a theory of criminal responsibility. The TCCA's conclusion that the evidence was sufficient to convict Petitioner of felony murder and facilitation of especially aggravated robbery was therefore not unreasonable.  Claim 8 is DENIED.

III.    Claims 1(a)-(d), (f)-(i), and (k)

With the exception of Claims 1(e) and 1(j), which the Court addressed on the merits *supra*, Petitioner failed to pursue his remaining ineffective-assistance-of-counsel claims through one complete round of the State's established appellate review process and the time for doing so has passed.  *See* Tenn. Code Ann. § 40-30-102(a),-102(c), and -117.  He therefore procedurally defaulted the claims.  As indicated earlier, Rice insists that the claims are properly before the Court because he is actually innocent of the crimes of which he was convicted.  He also asserts that Claims 1(d), 1(f), and 1(h) should not be barred from merits review because post-conviction appellate counsel was ineffective for failing to raise the issues on appeal.  Respondent argues that Petitioner has not asserted any valid ground for relief from the procedural bars.  The Court agrees.

First, Rice cannot establish that the failure of the Court to review the merits of the claims would result in a fundamental miscarriage of justice.  Such an injustice occurs where a petitioner demonstrates a "gateway" claim of actual innocence.  *Schlup v. Delo*, 513 U.S. 298, 315 (1995).

To open the gateway, a prisoner must "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. He must also show that, in light of the new evidence, "it is more likely than not that no reasonable juror would have convicted him." *Id.* at 327. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998).

In the present matter, the inmate alleges that his sister, Queca Rice, "would [have] testif[ied] that Petitioner was not the shooter since the actual shooter, Jessie Rogers, impliedly confessed to actually killing the victim." (D.E. 19 at PageID 2562.) According to Petitioner, Queca would describe how Rogers went to her "apartment alone, without Petitioner, and confessed that he was the actual shooter of the victim[.]" (*Id.*) He maintains that "Rogers admitted to Ms. Rice that the shooting occurred when he returned alone to the victim's house without Petitioner." (*Id.*)

The inmate also alleges, "to the best of [his] knowledge and belief," that undisclosed statements made by Cory Bowers to police were "inconsistent and probably flatly contradictory to the testimony Bowers gave at [the] trial against" Petitioner. (D.E. 35-1 at PageID 2628.) He believes that the purported statements show that he was "wrongful[ly] convict[ed]." (D.E. 30 at PageID 2608.) As discussed herein, Bowers testified at Petitioner's trial that Rice told him prior to the crimes that he was going to rob the victim and that he confessed afterwards that he shot the victim.

Petitioner's assertion of actual innocence is unavailing. He has not submitted an affidavit or even a letter from his sister indicating that she would be willing to testify as Petitioner describes.

27

And, even if a signed affidavit by Rice's sister were before the Court, it would be viewed with "a degree of skepticism" because the timing is suspect. *See Herrera,* 506 U.S. at 423 (O'Connor, J., concurring) (witness statements offered many years after the crime should be viewed with "a degree of skepticism").  In addition, any such affidavit, even when combined with the alleged undisclosed statements by Bowers purportedly proving that he lied at trial, would not establish Rice's actual innocence.  More to the point, Petitioner's factual innocence cannot be demonstrated because he confessed to police.  As the TCCA found in Petitioner's direct appeal, *see Rice*, 2011 WL 3556973, at *6, his confession established every element of felony murder under a theory of criminal responsibility.  The confession was also probative of all elements of facilitation of especially aggravated robbery.  Petitioner has therefore failed to demonstrate that a bar to merits review of his procedurally defaulted claims would result in a fundamental miscarriage of justice.

Secondly, post-conviction appellate counsel's failure to raise Claims 1(d), 1(f), and 1(h)--or, indeed, any of the procedurally defaulted ineffective-assistance claims--cannot serve as cause to excuse the procedural defaults.  Even if, as Petitioner argues, post-conviction appellate counsel should have included those issues in his brief to the TCCA, the Sixth Circuit has made clear that the ineffective assistance of post-conviction appellate counsel is not cause to excuse a procedural default.  *Young v. Westbrooks*, 702 F. App'x 255, 267 (6th Cir. 2017).

Therefore, all Claim 1 sub-claims, with the exception of Claims 1(e) and 1(j), are procedurally defaulted and the defaults have not been overcome or excused.  Those claims are DISMISSED.

IV.     <u>Claim 2</u>

Rice asserts that the State committed a *Brady* violation by failing to disclose statements he believes Bowers made during police interviews.  Respondent argues that Petitioner procedurally defaulted the *Brady* claim and that the default cannot be overcome because the claim is without merit.  The argument is well-taken.[5]

Petitioner avers in his sworn statement that

[t]o my knowledge, Bowers gave at least three (3) inconsistent/contradictory statements to law enforcement about me and the charges against me.  Bowers gave a statement on November 7, 2007, another statement to Task Force,[6] and another statement to officers Stacy and Fitzgerald a few months prior to October 30, 2007.  (Collectively referred to as "The Bowers Missing Statements").

These statements were, to the best of my knowledge and belief, inconsistent and probably flatly contradictory to the testimony Bowers gave at my trial against me, after he had accepted a deal from the State on his own charges.  Bowers' Missing Statements would have impeached his credibility, and provided the jury with enough doubt about the veracity of his testimony to acquit me.

(D.E. 35-1 at PageID 2628 (paragraph numbers omitted).)  The inmate further represents that, "[f]rom the beginning of [his] case throughout each and every phase, including post-conviction and the appeal of my post-conviction, commencing as early as at discovery even before trial, [he has] been requesting the various recorded statements of . . . Bowers."  (*Id.* at PageID 2627.)

---

[5]    As indicated earlier, Petitioner asserts in the Reply that post-conviction appellate counsel's failure to raise a *Brady* claim can excuse the procedural default.  The argument is without merit.  *See Young*, 702 F. App'x at 267 (ineffective assistance of post-conviction appellate counsel is not cause to excuse a procedural default); *Abdur'Rahman v. Carpenter*, 805 F.3d 710, 716 (6th Cir. 2015) (a post-conviction attorney's ineffective assistance will only excuse the procedural default of a trial-counsel-ineffective-assistance claim).

[6]    The Court assumes that Petitioner's reference to the "Task Force" in his sworn statement, his citation to the "Jackson Gang Force" in the Petition (D.E. 1 at PageID 8), and his reference to the "Jackson Gang Task Force" during his post-conviction testimony (D.E. 35-2 at PageID 2650), are all references to the "gang unit" that informed Lieutenant Fitzgerald that Bowers wanted to talk to law enforcement about the Martin murder.  (D.E. 13-6 at PageID 683.)

The documents submitted by Rice show that post-conviction counsel sought discovery and production of any undisclosed Bowers statements.  (D.E. 35-2 at PageID 2635; 2638, 2640-42.)  In an October 2015, letter to Lieutenant Fitzgerald, counsel asked the officer if he had any statements by Bowers "in [his] file."  (*Id.* at PageID 2635.)  He specifically asked for "Cory Bowers' first statement to [the] Task Force" and "first statement to Stacy and Fitzgerald 2 months prior to October 30, 2007." [7]  (*Id.*)  In response, Fitzgerald wrote to Assistant District Attorney Nina W. Seiler in April 2016.  (*Id.* at PageID 2639.)  In the letter, the officer stated that he and Sgt. Stacy had a "first meeting . . . with Cory Bowers . . . on October 3, 2007" at the Yazoo, Mississippi, Federal Correctional Institute.  (*Id.*)  Fitzgerald explained that the "meeting lasted long enough for [Bowers] to tell us that he wanted to speak with his attorney before he said or did anything."  (*Id.*)  Fitzgerald also reported that he and Stg. Stacy returned to the prison on November 7, 2007, to interview Bowers, after he "indicated he was ready to speak with [them.]" (*Id.*)

Post-conviction trial counsel "was . . . allowed to go to the District Attorney's office and comb through their file [him]self, page by page, in search of any [missing Bowers'] statement."  (*Id.* at PageID 2642.)  However, "their file did not contain any such statement[.]"[8]  (*Id.*)

---

[7] Post-conviction counsel also sought a copy of Rice's own November 12, 2007, interview with law enforcement.  (*See* D.E. 35-2 at PageID 2635 (¶1).)  Counsel did so in support of Petitioner's claim--asserted only in the post-conviction trial court--that trial counsel should have argued at the suppression hearing that Petitioner invoked his right to counsel at his November 12th interrogation.  The first paragraph of Fitzgerald's April 2016 letter (*id.* at PageID 2639) is in reference to that separate issue.

[8] In an email from Assistant District Attorney Nina Siler to post-conviction counsel, she states that counsel has "the only statement in possession by the MCSD of Bowers (on 11/7/07)."  (D.E. 35-2 at PageID 2640.)  Although her comment suggests that post-conviction counsel had the November 2007 statement, counsel's 2017 email to the Board of Professional Responsibility seems to indicate that he did not have and did not find any such statement during his review of the District

At the post-conviction hearing, trial counsel testified that he knew that Cory Bowers had "implicated [] Rice and [had given] a statement to Lieutenant Fitzgerald while he was in federal custody." (D.E. 13-22 at PageID 1436.)  Counsel was apprised of these matters concerning Bowers though "the part of the case that was given to [him] in discovery[.]"  (*Id.* at PageID 1437.)

At the post-conviction hearing, Petitioner testified to his belief that the "State [had] some . . . sort of written transcript of" a statement by Bowers to Lieutenant Fitzgerald in August 2007. (*Id.* at PageID 1391.)  He insisted that he could "show proof to the Court that Lieutenant Fitzgerald said [in his trial testimony that] he received information from the Jackson Gang Task Force and he turned around, the information led him, and he went to Yazoo City, Mississippi, two months prior to October 30, 2007."  (*Id.* at PageID 1392.)  Petitioner also maintained that Fitzgerald's April 2016 letter proves that an August 2007 interview took place.  (*Id.* at PageID 1392-94.)

The State's post-conviction attorney objected to the testimony, arguing that the post-conviction petition did not challenge the State's alleged failure to turn over an August 2007 statement to the defense.  The court overruled the objection and allowed Petitioner to testify on the subject.  (*Id.* at PageID 1389-93.)  The court ultimately denied relief on all grounds raised but did not expressly address Petitioner's claim that the State failed to disclose the alleged August 2007 statement.  (*See* D.E. 13-20; D.E. 13-19 at PageID 1319-21.)  Petitioner did not appeal the denial of that claim.  (*See* D.E.13-17 at PageID 2431.)

In September 2017, Rice submitted to the Tennessee District Public Defenders Officer a public records request seeking, among other things, the alleged missing Bowers' statements. (D.E.

---

Attorney's file and he surmised that the interview might not have been recorded or reduced to writing.  (*Id.* at PageID 2642.)

35-2 at PageID 2645.)  The request was denied because Petitioner had requested items that would

be in his defense attorney's file, and thus not subject to a public records request.  (D.E. 42-1 at

PageID 2698.)  Rice was advised that his attorney "has been copied on this letter and will comply

or contact you shortly about the requested documents."[9]  (*Id.*)

Petitioner has submitted in the present case "p. 11" of the "District Attorney's opening

statement," which he maintains evidences the existence of a statement by Bower to the gang unit.

(D.E. 39 at PageID 2676.)  The portion of the opening statement on which he relies reads as

follows:

> But then law enforcement gets a break.  They are contacted by a federal inmate
> named Cory Bowers.  Now, I mentioned his name earlier and nobody knew him.
> But we've got a federal inmate who contacts law enforcement and says, "Hey, I
> know something about a murder and I'm willing to tell you that."

(D.E. 39-1 at PageID 2678.)

Rice also insists, as he did in his post-conviction testimony, that Officer Fitzgerald's cross-

examination testimony is proof that Bowers gave statements to the gang unit and to Fitzgerald and

Stacy in August 2007.  (D.E. 39 at PageID 2676; D.E. 39-1 at PageID 2679-82.)  As for the

November 7, 2007, interview, he further points to Fitzgerald's April 2016 letter as proof that there

existed a written or recorded statement of that meeting.

Respondent argues that Petitioner's allegation that three undisclosed statements by Bowers

exist is unfounded.  He also characterizes as mere speculation Rice's assertion that the contents of

the purported statements would show that Bowers lied at trial.  He therefore insists that Petitioner

---

[9]  Petitioner did not file his attorney's response with this Court.

has not shown that the alleged statements were exculpatory or that he was prejudiced by their non-disclosure.

In *Brady*, the Supreme Court held that a criminal defendant's right to due process is violated when prosecutors withhold from the defense evidence favorable to the accused, where the evidence is material either to guilt or punishment.  *Brady*, 373 U.S. at 87.  A *Brady* violation has three components: "the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [the] evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008) (quoting *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999)).

"[T]he third *Brady* factor of prejudice [is] also described as the 'materiality' of the evidence."  *Brooks v. Tennessee*, 626 F.3d 878, 891 (6th Cir. 2010) (citing *Strickler,* 527 U.S. at 282) (describing the "third component" of the *Brady* analysis as "whether petitioner has established the prejudice necessary to satisfy the 'materiality' inquiry").  "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Bagley*, 473 U.S. at 682 (internal quotation marks omitted).  "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995).

In undertaking "[t]he materiality inquiry," a court must "weigh[] 'the value of the undisclosed evidence relative to the other evidence produced by the state.'"  *United States v.*

*Ramer*, 883 F.3d 659, 672 (6th Cir. 2018) (quoting *Eakes v. Sexton*, 592 F. App'x 422, 427 (6th

Cir. 2014).   "[A] confession is strong evidence of [] guilt" that may preclude a finding of

materiality.   *Hughbanks v. Hudson*, 2 F.4th 527, 541 (6th Cir. 2021), *reh'g denied* (Aug. 13,

2021), *cert. denied sub nom. Hughbanks v. Shoop*, No. 21-6285, 2022 WL 516052 (U.S. Feb. 22,

2022) (quoting *Gumm* v. Mitchell, 775 F.3d 345, 371 (6th Cir. 2014)) (alterations in original).

However, the Sixth Circuit has "found that 'there are numerous reasons why a jury [might]

discount[ ] Petitioner's  statements to the police.'"  *Id.* at 541-42 (quoting *Gumm*, 775 F.3d at 371.)

Some reasons to discount a confession include circumstances suggesting that the petitioner did not

have the "capacity to understand what was happening to him and challenge the legitimacy of his

statements," and the fact that "detectives consistently correct[ed] [the petitioner] when he offered

details of the crime" or asked him "leading questions [or] supplied him with facts."  *Id.* at 542

(citing *Bies v. Sheldon*, 775 F.3d 386, 402-03 (6th Cir. 2014)).

A State's failure to disclose materials in violation of *Brady* constitutes cause and prejudice

to excuse the procedural default of the *Brady* claim.  *Banks*, 540 U.S. at 691.  More specifically,

"cause" to excuse the procedural default "parallel[s]" the *Brady* element that the State withheld

evidence.  *Id.*  Prejudice "parallel[s]" *Brady* prejudice.  *Id.*; *see also Brooks*, 626 F.3d at 891 (citing

*Banks*, 540 U.S. at 691) ("[A] petitioner who proves a *Brady* violation demonstrates cause and

prejudice to excuse procedural default of the *Brady* claim.")

In the present matter, Petitioner has not shown the existence of undisclosed impeaching

evidence.  First, his belief that there was an August 2007 statement taken by Fitzgerald and Stacy

appears to be the result of his misreading of both Fitzgerald's cross-examination testimony and

Fitzgerald's April 2016 letter.  As mentioned herein, during his post-conviction testimony Rice

34

told the judge that he could "show proof to the Court that Lieutenant Fitzgerald said [in his trial testimony that] he received information from the Jackson Gang Task Force and he turned around, the information led him, and he went to Yazoo City, Mississippi, two months prior to October 30, 2007." (D.E. 13-22 at PageID 1392.)  Fitzgerald's actual testimony, however, was that the gang unit had informed him "[a]pproximately two months" prior to his receipt of an October 30, 2007, letter from Bowers, that Bowers wanted to talk.  (D.E. 13-6 at PageID 709-710.)  The officer explained that, during that two-month period of time—i.e., from the time he first heard from the gang unit until the time he received Bowers' letter—he met with Bowers "[o]ne time."  (*Id.* at PageID 710.)  The meeting took place at "the federal penitentiary" in Yazoo, Mississippi.  (*Id.*)  Fitzgerald's April 2016 letter, which Petitioner insists also supports the existence of an August 2007 statement, is consistent with the officer's testimony.  In the correspondence, Fitzgerald explains that he and Sgt. Stacy interviewed Bowers at the facility in Yazoo on October 3, 2007, and then again on November 7, 2007.  (D.E. 35-2 at PageID 2639.)  The October 3rd interview was thus the "[o]ne time" during the two-month period ending October 30th that was referenced by Fitzgerald in his trial testimony.[10]

As for an alleged recorded or written statement by Bowers to the gang unit, Fitzgerald's testimony was that Bowers had "indicate[d] to law enforcement that he had information about this homicide" and that the "gang unit" informed him of that.  (D.E. 13-6 at PageID 683.)  Nothing, including the prosecutor's opening statement, suggests that the gang unit did anything more than

---

[10] Insofar as Petitioner may mean to complain that no written statement or transcript was disclosed to him for the October 3rd interview, Fitzgerald explained in his letter that the interview "was not recorded and there was no paperwork associated with that meeting" because "[t]he meeting lasted long enough for [Bowers] to tell us that he wanted to speak with an attorney before he said or did anything."  (D.E. 35-2 at PageID 2639.)

simply receive from Bowers an offer to discuss the Martin murder.  At bottom, Petitioner has not shown that the gang unit conducted an interview with Bowers about the Martin murder and that the interview was recorded in some way.

The November 2007 interview of Bowers is a closer call.  It is undisputed that Fitzgerald and Stacy interviewed Bowers on that date.  It also appears that the prosecution never disclosed a written statement from, or recording of, the interview.  However, post-conviction counsel searched the District Attorney's files and did not find any such material, and his direct inquires yielded nothing.  Petitioner's belief that the interview was recorded or otherwise memorialized in writing, and his further allegation that the State withheld the material both prior to trial and during the post-conviction proceedings, are therefore speculative.

Nevertheless, even assuming the November 2007 interview was recorded or memorialized in writing, and that there also existed written or recorded statements given by Bowers to the gang unit and to Fitzgerald and Stacy in August 2007, and further assuming that all of these statements were "flatly contradictory" to Bowers' trial testimony, Petitioner cannot show that he was prejudiced by their nondisclosures in light of his November 13, 2007, confession.  As discussed, Bowers' testimony supported the prosecution's theory of direct responsibility.    However, the State also proceeded on a theory of criminal responsibility for the conduct of another.  The theory was disclosed in the prosecutor's opening statement, addressed during closing arguments, and made part of the jury instructions.  (D.E. 13-5 at PageID 480-82; D.E. 13-7 at PageID 787, 791, 797-802, 806, 809-27, 846.)  As the TCCA found in Rice's direct appeal, the State's primary proof under that theory was Rice's own statement to law enforcement on November 13, 2007.  Petitioner has not shown that when he gave his statement he did not have "the capacity to understand what

36

was happening to him and challenge the legitimacy of his statements" or that the officers corrected

him, asked him leading questions, or otherwise conducted the interview in a way that could have

caused the jury to have doubts about the confession. *Hughbanks*, 2 F.4th at 542. The jury could,

therefore, have entirely disregarded Bowers' testimony and still convicted Petitioner of both

crimes.[11]

The inmate has thus failed to establish a reasonable probability that the result of his trial

would have been different had the State disclosed statements by Bowers which could have

impeached his trial testimony. In other words, even if Petitioner could show that the prosecution

failed to disclose such exculpatory materials, the nondisclosure would not "undermine confidence

in the outcome of the trial." *Bagley*, 473 U.S. at 682.

Because Petitioner has not established prejudice, the procedural default of his *Brady* claim

is not excused. Claim 2 is therefore DISMISSED.

V.     <u>Claims 3-7</u>

---

[11]   Prejudice is elusive for the additional reason that the jury was given ample reason to disbelieve Bowers even without hearing his alleged "flatly contradictory" inconsistent prior statements. As mentioned in the Background section herein, trial counsel brought out during his cross-examination of Bowers that the witness was a convicted drug trafficker, that he was cooperating in order to get a more lenient sentence in his federal case, and that Petitioner's brother, Robert Rice, had turned him into federal authorities. *See Brooks*, 626 F.3d at 893-94 (although undisclosed evidence of the informant-witness's history of mental illness "would have provided additional reasons not to credit his testimony," the information was not material because the witness's "credibility was effectively impeached at trial" through evidence that the witness "had an extensive criminal history," was a "professional snitch," and had "received benefits from snitching") (relying on *Bell v. Bell*, 512 F.3d 223, 237 (6th Cir. 2008) (en banc)).

In Claim 3, Rice asserts that the prosecution failed to preserve the alleged missing Bowers' statements in violation of *Arizona v. Youngblood*, 488 U.S. 51 (1988).  He maintains in Claim 4 that prosecutor misconduct "led to the loss or destruction . . . of favorable evidence," in violation of *Darden v. Wainwright*, 477 U.S. 168 (1986).  (D.E. 1-1 at PageID 11.)  In Claim 5 he posits that his right to counsel was violated pursuant to *Massiah v. United States*, 377 U.S. 201 (1964), "since [he] specifically invoked his desire to have his counsel present before he spoke with police on November 13, 2007."  (*Id.* at PageID 12.)  He insists in Claim 6 that the jury instructions were constitutionally defective under *California v. Roy*, 117 S. Ct. 719 (1996), because they "failed to instruct on every element of the offense, including the *mens rea* element of the murder conviction." (*Id.*)  And in Claim 7 he argues that his sentence of life-plus-twelve-years violates the Eighth Amendment.  (*Id.* at PageID 13.)  Respondent maintains that the claims were not exhausted in the state courts and are therefore procedurally barred from federal habeas review.  Rice acknowledges the procedural defaults but argues that his actual innocence overcomes the bar, and that post-conviction appellate counsel's failure to raise Claims 3 and 7 is cause to excuse the defaults.

Petitioner's proffered reasons for why the Court should review the merits of the claims are rejected.  First, as the Court has already found, Petitioner does not have a valid gateway claim of actual innocence.  In addition, his assertion that post-conviction appellate counsel's alleged ineffective assistance in failing to raise Claims 3 and 7 is cause to excuse the defaults has no merit. For one thing, a post-conviction appellate counsel's alleged ineffective assistance cannot excuse procedural defaults.  *See Young*, 702 F. App'x 255 at 267.  For another, the claims are not ineffective-assistance-of-counsel claims.  As such, they are not subject to *Martinez's* exception to

*Coleman*'s rule that the ineffective assistance of post-conviction counsel is not cause to excuse a procedural default.  *See Abdur'Rahmanr*, 805 F.3d at 716.

Petitioner therefore has not established that he is entitled to merits review of Claims 3 through 7.  The claims are DISMISSED.

VI.     Claim 9

Rice asserts in Claim 9 that he was denied due process as a result of the cumulative errors at trial.   Relying on the Sixth Circuit's decision in *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006), Respondent argues that the claim should be dismissed because it is non-cognizable in this § 2254 proceeding.  The Court need not reach the cognizability issue because Petitioner has not established the claim's merits.

In its 2006 decision in *Williams*, the Sixth Circuit held that cumulative-error claims are non-cognizable on federal habeas review because the Supreme Court has yet to recognize such a basis for relief.  *See Williams*, 460 F.3d at 816.  More recently, in a 28 U.S.C. § 2255 case, the Sixth Circuit again expressed doubt that cumulative-error "theory . . . is available" to habeas petitioners.  *See Dimora v. United States*, 973 F.3d 496, 507 (6th Cir. 2020) (citing *United States v. Brown*, 528 F.3d 1030, 1034 (8th Cir. 2008)).

Nevertheless, in *Ramsey v. Phillips*, No. 20-3452, 2020 WL 9423257, at *1 (6th Cir. Nov. 4, 2020) (unpublished), the court held that, even if cognizable, cumulative-error claims will not succeed if the alleged underlying errors form the basis for claims that are "procedurally barred or without merit[.]"  *Id.* at *3; *see also Heckathorn v. Baldauf*, No. 4:20 CV 2820, 2022 WL 171540, at *4 (N.D. Ohio Jan. 19, 2022) (citing *Ramsey*, 2020 WL 9423257, at * 3) (denying cumulative-

error claim because "the individual claims making up the cumulative error claim [were] procedurally barred or without merit").

Even assuming in the present case that Claim 9 is cognizable, Petitioner is entitled to no relief. The Court has found that the underlying claims that are the components of the cumulative-error claim are non-meritorious or procedurally defaulted. Claim 9 is therefore without merit and is DENIED.

For the foregoing reasons, the Petition, as amended, is DENIED. Judgment shall be entered for Respondent.

APPEAL ISSUES

A § 2254 petitioner may not proceed on appeal unless a district or circuit judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2)-(3). A substantial showing is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'" *Dufresne v. Palmer*, 876 F.3d 248, 253 (6th Cir. 2017) (per curiam) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition, as amended. Because any appeal by Petitioner does not deserve attention, the Court DENIES a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed in forma pauperis in the appellate court. *Id.*

In this case, for the same reason it denies a COA, the Court CERTIFIES, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith. Leave to appeal in forma pauperis is therefore DENIED.[12]

IT IS SO ORDERED this 31st day of March 2022.

s/ J. DANIEL BREEN
UNITED STATES DISTRICT JUDGE

---

[12] If Petitioner files a notice of appeal, he must also pay the full $505.00 appellate filing fee or file a motion to proceed in forma pauperis and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.